USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___6/13/2020___

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**Ruthann Cohen-Aikens,**

                                    **Plaintiff,**

            -against-

**Andrew M. Saul, Commissioner of Social**
**Security,[1]**

                                    **Defendant.**

**1:19-cv-04443 (SDA)**

**OPINION AND ORDER**

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE.**

On May 15, 2019, Plaintiff Ruthann Cohen-Aikens ("Plaintiff" or "Cohen-Aikens") filed this

action pursuant to § 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), and

§ 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), challenging the final decision of the Commissioner

of Social Security, denying her application for disability insurance benefits ("DIB"). (Compl., ECF

No. 1.) Presently before the Court are Plaintiff's motion for judgment on the pleadings (Pl.'s

Notice of Mot., ECF No. 21) and the Commissioner's cross-motion for judgment on the pleadings.

(Comm'r Notice of Mot, ECF No. 25.) For the reasons set forth below, Plaintiff's motion is

GRANTED IN PART and DENIED IN PART, the Commissioner's cross-motion is DENIED and the case

is remanded for further proceedings.

---

[1] This action was filed against Defendant Nancy Ann Berryhill, the then Acting Commissioner of the Social
Security Administration ("SSA"). Andrew M. Saul is now the Commissioner of the Social Security
Administration. Pursuant to Federal Rule of Civil Procedure 25(d), Saul is hereby substituted for Acting
Commissioner Nancy A. Berryhill as the defendant in this action, and the Clerk of Court is respectfully
directed to amend the caption as set forth above.

## BACKGROUND

### I.      Procedural History

On December 22, 2015, Cohen-Aikens filed an application for DIB[2] with a disability onset date of December 12, 2015. (Administrative R. ("R."), ECF No. 14, 130.) The SSA denied her application on February 5, 2016, and Cohen-Aikens requested a hearing before an Administrative Law Judge ("ALJ"). (R. 68, 84-86.) A hearing was held before ALJ Mark Solomon on April 10, 2018. (R. 32-67.) In a decision dated June 15, 2018, ALJ Solomon found that Cohen-Aikens was not disabled. (R. 16-31.) On July 16, 2018, she requested review of the ALJ's decision by the Appeals Council. (R. 128.) ALJ Solomon's decision became the Commissioner's final decision when the Appeals Council denied Cohen-Aikens's request for review on March 11, 2019. (R. 1-7.) This action followed.

### II.     Non-Medical Evidence

Cohen-Aikens was born on July 28, 1954 and was 61 years old on the alleged onset date. (R. 37.) She obtained a General Equivalency Degree (the equivalent of a high school diploma) in 1981. (R. 38.) Cohen-Aikens has lived in the same apartment in Manhattan for 30 years. (R. 184.) She had two children, a daughter, who is deceased, and a son, who resides next door to her. (*Id.*)

Cohen-Aikens previously worked for the Internal Revenue Service ("IRS"), first as a clerk from January 2000 to May 2001 and then as an Initial Assistance Representative ("IAR") from May 2001 to December 2015. (R. 50, 159, 176.) As an IAR, she would greet taxpayers, take

---

[2] To qualify for disability insurance benefits, a claimant must be both disabled and insured for benefits. 42 U.S.C. § 423(a)(1)(A) & (C); 20 C.F.R. §§ 404.101, 404.120 & 404.315(a). The last date a person meets these requirements is commonly referred to as the date last insured ("DLI"). Cohen-Aiken's DLI is June 30, 2020. (R. 29.)

payments, stock forms, distribute forms and type transcripts. (R. 50-52.) For substantive questions, she would direct taxpayers to more appropriate IRS personnel. (R. 51.) She lifted boxes of forms that weighed up to 20 pounds and did not supervise other people. (R. 51-52, 160.)

### III.   Relevant Medical Evidence

#### A.      Riverside Orthopaedic And Sports Medicine Associates

From 2008 to 2017, Cohen-Aikens received treatment from various doctors at Riverside Orthopaedic and Sports Medicine Associates ("Riverside") for pain in her knees, shoulder, neck and back. (R. 218-31, R 306-75, 385-89, 420-33.) Riverside's records reflect that she had a history of orthopedic conditions with onset dates in 2006 and 2007, including brachial neuritis or radiculitis,[3] complete rupture of the rotator cuff, pain in lower leg joint, ankle sprain, rotator cuff syndrome of shoulder and shoulder sprain. (R. 368.) Her medical history also included lower leg contusion, chondromalacia[4] of the patella, tear of the knee meniscus, prepatellar bursitis[5] and osteoarthrosis[6] in her lower leg. (*Id*.)

---

[3] Neuritis is an "inflammation of a nerve, with pain and tenderness, anesthesia and paresthesias, paralysis, wasting, and disappearance of the reflexes." *Dorland's Illustrated Medical Dictionary* ("*Dorland's*") 1263 (32d ed. 2012). Brachial means "pertaining to the upper limb." *Id*. at 244. "Radiculitis" is an "inflammation of the root of a spinal nerve, especially that portion of the root which lies between the spinal cord and the intervertebral canal. Called also radicular neuritis." *Id*. at 1571.

[4] Chondromalacia is defined as "softening of the articular cartilage, most frequently in the patella." *Dorland's* at 352.

[5] "Prepatellar bursitis is an inflammation of the bursa in the front of the kneecap (patella). It occurs when the bursa becomes irritated and produces too much fluid, which causes it to swell and put pressure on the adjacent parts of the knee." *Jennings v. Ottey*, No. 14-CV-01736 (WNN), 2015 WL 4496431, at *3 (D. Md. July 22, 2015) (citation omitted).

[6] Osteoarthrosis is "osteoarthritis." *Dorland's* at 1345. Osteoarthritis is "a noninflammatory degenerative joint disease seen mainly in older persons, characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane. It is accompanied by pain, usually after prolonged activity, and stiffness, particularly in the morning or with inactivity." *Id*. at 1344.

On June 7, 2011, Cohen-Aikens saw Dr. Jonathan Levin at Riverside with complaints of severe neck pain radiating down her arm. (R. 229-30, 335-37, 431-33.) On examination, Dr. Levin found cervical tenderness with pain elicited by motion, as well as normal strength and reflexes. (R. 230, 337, 432.) He assessed Cohen-Aikens with cervical spondylosis,[7] brachial neuritis and cervicalgia.[8] (R. 231, 337, 433.) On July 12, 2011, she returned to see Dr. Levin for neck pain who made similar findings to those he made the prior month, and she was assessed with cervicalgia. (*See* R. 334-35.) Trigger point injections[9] were administered to Cohen-Aikens for her pain. (R. 335.)

On July 22, 2011, Cohen-Aikens saw Dr. Louis Re at Riverside for an injection into her right knee. (R. 331-32.) An examination showed she walked with a limp and used a cane and her right knee showed no warmth or swelling, but showed tenderness and restricted motion. (R. 332.) On September 29, 2011, Cohen-Aikens saw Dr. Re and received injections in both knees. (R. 328-30.) An examination showed warmth and swelling in both knees, as well as tenderness. (R. 330.) On November 18, 2011, she saw Dr. Re for an injection into her right knee. (R. 326-28.) An examination showed no warmth or swelling in either knee, but showed tenderness and restricted motion. (R. 328.)

---

[7] Spondylosis is the "dissolution of a vertebra." *Dorland's* at 1754.

[8] Cervicalgia is neck pain. "Cervical" means pertaining to the neck. *Dorland's* at 333. "-algia" is a word termination denoting a painful condition. *Id*. at 48.

[9] "Trigger point injections are injections intended to deactivate trigger points (discrete spots in a taut band of skeletal muscle) and provide pain relief." *Bailey v. Colvin*, No. 15-CV-09287 (LTS) (RLE), 2016 WL 11272144, at *5 (S.D.N.Y. Dec. 13, 2016), *report and recommendation adopted in part*, 2017 WL 1102671 (S.D.N.Y. Mar. 24, 2017) (citation omitted).

In 2012, Cohen-Aikman continued to receive treatment at Riverside for her knee and back pain. On February 17, 2012, Dr. Re administered an injection into Cohen-Aikman's right knee and on April 4, 2012 and September 7, 2012, Dr. Elias Kassipidis administered injections into her right knee. (R. 320-28.) On November 5, 2012, she saw Dr. Joe Vongvorachoti for lower back pain. (R. 224-27, 317-19, 426-29.) On examination, Cohen-Aikens walked with a limp, used a cane and showed antalgic gait. (R. 225, 318, 427.) Her lumbar spine showed restricted range of motion, pain with extension and diminished knee and ankle reflexes, but otherwise full motor strength and normal sensation. (R. 226, 318-19, 428.) Dr. Vongvorachoti noted that a lumbar x-ray showed moderate arthritis, assessed Cohen-Aikens with lumbar spondylosis and lower leg osteoarthrosis and prescribed a straight cane. (R. 226, 319, 428.) On November 6, 2012, Dr. Vongvorachoti wrote a letter stating that he was treating Cohen-Aikens for lumbosacral spondylosis without myelopathy[10] and lower leg osteoarthrosis and opining that she needed a chair with back support "[d]ue to her consistent back pain and arthritis" because "[e]xtensive sitting without proper support may otherwise worsen [her] conditions." (R. 223, 425.) On December 20, 2012, Dr. Kassipidis gave Cohen-Aikens injections in both knees. (R. 316.) On examination, she had normal gait with no assistive devices, and her knees showed warmth, swelling, tenderness and pain on motion. (R. 316.)

In 2013, Cohen-Aikens continued to receive treatment at Riverside for her knee pain. On January 30, 2013, Dr. Kassipidis gave her an injection in her left knee and on June 13, 2013, he gave her injections in both knees. (R. 219-21, 311-14, 421-24. Physical examinations showed a

---

[10] Myelopathy is "any of various functional disturbances of pathological changes in the spinal cord." *Dorland's* at 1220.

normal gait, no limp and no assistive device, and her knees showed warmth, swelling, pain on range of motion and tenderness. (R. 220, 313, 316, 422.) On June 20, 2013, Dr. Kassipidis wrote that he had been treating Cohen-Aikens for advanced arthritis of both knees, which caused pain, swelling and lack of range of motion. (R. 218, 420.) He stated that "in order for this patient to achieve and maintain maximum functional capacity while performing daily activities, it is medically necessary for her to undergo bilateral total knee replacement." (*Id*.) On October 14, 2013, Dr. Kassipidis gave Cohen-Aikens injections in both knees. (R. 308.) She reported knee catching, locking, buckling and instability. (*Id*.) An examination showed normal gait with no assistive device, and her knees showed warmth, swelling, tenderness of the medial joint line and pain on motion. (*Id*.)

On November 1, 2017, Cohen-Aikens saw Dr. Vongvorachoti at Riverside with complaints of neck pain, as well as symptoms of muscle aches, arthralgia, joint pain and back pain with numbness. (R. 386-87.) On examination, she appeared in no acute distress, and her cervical spine showed tenderness, restricted range of motion, and absent or diminished reflexes in her upper extremities, but 5/5 strength and intact sensation. (R. 388.) Cohen-Aikens was assessed with cervical spondylosis (without myelopathy)[11] and myofascial pain[12] due to moderate degenerative joint disease, given a trigger point injection, and referred to physical therapy. (*Id*.)

---

[11] Myelopathy is "any of various functional disturbances of pathological changes in the spinal cord." *Dorland's* at 1220.

[12] Myofascial pain is "attributed to trigger points in muscles and their fascia, with more specific points of origin than with fibromyalgia." *Dorland's* at 1363.

B.    **The Hospital For Special Surgery**

From 2013 to 2017, Cohen-Aikens received treatment from various medical professionals at The Hospital for Special Surgery ("HSS"). (R. 262-304, 402-19.) She had an initial consult on October 21, 2013 with Physician Assistant ("PA") Nicole Fein regarding knee replacement surgery. (R. 262-63.) Cohen-Aikens reported that she had had a fall five to six years earlier, which was when her knee symptoms started. (R. 262.) On examination, both of her knees had pain with extreme flexion. (*Id*.) PA Fein noted that x-rays showed degenerative changes in the right knee and severe degenerative changes and significant patellofemoral[13] arthritis in the left knee, and she recommended a total left knee replacement and a partial right knee replacement. (R. 262-65.)

On January 18, 2014, Dr. Andrew Pearle at HSS performed a total left knee replacement. (R. 266-69.) On April 17, 2014, Dr. Pearle performed a partial right knee replacement and arthroplasty,[14] noting that Cohen-Aikens had severe medial compartment degenerative arthritis. (R. 274-75.) On July 29, 2014, Dr. Pearle reported that Cohen-Aikens was "doing great" from both knee replacements and that she had "no interval complaints." (R. 279.)

On December 4, 2014, Cohen-Aikens saw Dr. Robert S. Griffin, a pain management specialist at HSS, complaining of low back pain radiating to her hamstrings. (R. 287-88, 299-300.) She reported that she had experienced back pain for about five years and that her hamstring pain began approximately May 2014. (R. 287, 299.) Cohen-Aikens stated that she was independent in her activities of daily living, but her symptoms limited her ambulation and exercise. (*Id*.) Cohen-

---

[13] Patellofemoral means "pertaining to the patella and the femur." *Dorland's* at 1395.

[14] Arthroplasty is "plastic surgery of a joint or of joints; the formation of movable joints." *Dorland's* at 158.

Aikens had joined a gym in October 2014 and used a bicycle and weight machines, which she felt improved her symptoms to some extent. (*Id*.) An examination showed minimal tenderness, negative straight leg raising, unremarkable gait, and intact strength and sensation. (R. 288, 300.) Dr. Griffin ordered a magnetic resonance imaging ("MRI") of her lumbar spine. (*Id*.) An MRI was conducted on December 13, 2014, which showed developmental stenosis,[15] moderate central canal stenosis, severe facet arthrosis, moderate to severe left foraminal stenosis, and mild to moderate right foraminal stenosis at L4-L5; and mild canal stenosis with broad-based bulge, severe facet arthrosis and synovitis,[16] and mild to moderate bilateral foraminal stenosis at L5-S1. (R. 288-90, 302-04.)

On December 23, 2014, Cohen-Aikens again saw Dr. Griffin. (R. 285-86, 297-98.) She reported no major changes from her prior visit two weeks earlier. (R. 285, 297.) Dr. Griffin assessed chronic lumbar radicular pain and low back pain. (R. 286, 298.) He prescribed physical therapy and discussed a possible steroid injection. (*Id*.)

On January 8, 2015, Cohen-Aikens saw PA Fein as a follow up to her knee replacement surgeries. (R. 280.) PA Fein noted that Cohen-Aikens was "doing really well overall," was "working out a lot at the gym" and had "good range of motion." (*Id*.) PA Fein also noted that Cohen-Aikens was "going to work on hamstring stretches with physical therapy since she is going to be starting that for her back." (*Id*.)

---

[15] Stenosis is "an abnormal narrowing of a duct or canal." *Dorland's* at 1769.

[16] Synovitis is "inflammation of a synovium," which is "the inner of two layers of the articular capsule of a synovial joint, composed of loose connective tissue and having a free smooth surface that lines the joint cavity." *Dorland's* at 1127, 1856.

On July 10, 2015, Dr. Griffin administered an epidural injection for radicular pain. (R. 283-84, 295-96, 416-18.) On August 18, 2015, when Cohen-Aikens saw Dr. Griffin for a follow-up visit, she reported "substantial pain relief" following the injection. (R. 281-82, 293-94.) Dr. Griffin noted that Plaintiff worked at a "desk job at the IRS" and "ha[d] been able to continue to work despite her back pain." (R. 281, 293.)

On February 23, 2016, at the request of Dr. Pearle, x-rays were taken at HSS of Cohen-Aikens's hips, knees and ankles. (R. 409-10.) The hip x-rays were normal, but the right knee x-rays showed moderate lateral displacement of the right patella, the left knee x-ray showed degenerative changes consistent with a meniscal tear, and the ankle x-rays showed minimal osteophyte[17] formation. (R. 409-10.)

On July 26, 2016 and July 25, 2017, Dr. Griffin administered lumbosacral epidural steroid injections to Cohen-Aikens. (R. 403-08.) On November 17, 2017, she returned to Dr. Griffin for treatment of lumbosacral pain. (R. 203-05, 440-42.) Cohen-Aikens reported having "excellent relief which lasted for about 3 to 4 months" after her July 2017 epidural injection, but she said that "[h]er pain had gradually begun to return" with low back pain radiating to both of her calves. (R. 203, 440). She said she was walking slowly and had pain turning in bed, and she rated her current pain as 8/10. (*Id*.) An examination showed minimal lumbar tenderness, intact neurological findings, and intact strength and sensation in her extremities. (R. 204, 441.) Dr. Griffin prepared disability paperwork at Cohen-Aikman's request, ordered an updated MRI, prescribed physical therapy and planned another injection. (R. 205, 442.)

---

[17] An osteophyte is a "bony escrescence or osseous outgrowth." *Dorland's* at 1348.

On November 17, 2017, Dr. Griffin completed a Lumbar Spine Residual Functional Capacity ("RFC") Questionnaire. (R. 435-39.) In his Questionnaire responses, Dr. Griffin diagnosed lumbar radiculopathy. (R. 436.) In addition, he opined that Cohen-Aikens (a) can only sit for 30 minutes at a time and will need to stand for 10 minutes before needing to walk around; (b) in an 8-hour workday, can sit for at least six hours with required periods of walking around every 30 minutes for 3 minutes; (c) will need to take unscheduled breaks every hour to rest for a few minutes; (d) can "frequently" lift/carry less than 10 pounds for work, but never anything 10 pounds or more; and (e) can never twist, stoop or crouch/squat. (R. 436-38.) Dr. Griffin further opined that Cohen-Aikens's pain would "frequently" interfere with her ability to maintain attention and concentration. (R. 436.)

### C.     Columbia Doctors

In March 2016, Dr. Natasha Desai, an orthopedic surgeon at Columbia University Medical Center, saw Cohen-Aikens for left shoulder and elbow pain. (R. 233.) Dr. Desai believed that the pain "stem[med] from both cervical disc disease and left shoulder rotator cuff tendonitis" and recommended a course of physical therapy. (*Id*.)

On October 6, 2017, Cohen-Aikens saw Dr. Martin Frankel of Columbia Doctors for a health maintenance exam.[18] (R. 208-10, 444-47.) On examination, Dr. Frankel found that she had pain in the back with bending. (R. 210, 446.) He assessed that Cohen-Aikens had, among other things, lumbar spondylosis. (*Id*.) On January 10, 2018, Dr. Frankel wrote that he had read Dr.

---

[18] Dr. Frankel had been treating Cohen-Aikens since 2000 (R. 170), and the Commissioner refers to Dr. Frankel as her "primary care physician." (Comm'r Mem. In Opp. To Pl.'s Mem. And In Support Cross-Motion For J. On The Pleadings ("Comm'r Mem."), ECF No. 26, at 8.)

Griffin's November 17, 2017 Lumbar Spine RFC Questionnaire responses (*see* R. 435-39) and certified that he concurred with Dr. Griffin's assessment. (R. 207, 443.)

**D.    Dr. Russel C. Huang**

On January 29, 2018, Ms. Cohen-Aikens consulted with Dr. Russel Huang, an orthopedic spine surgeon, regarding surgical options for her back. (R. 191-96, 453-58.) She complained of diffuse axial low back pain associated with leg pain that radiated to her calves, with a secondary complaint of axial neck pain with numbness and tingling in her left arm and weakness in her left grip strength. (R. 191, 453.) Cohen-Aikens stated that her back pain prevented her from walking for more than two blocks before her legs buckled; that she had issues with her fine motor skills, left-hand clumsiness, gait imbalance and limping gait after walking two blocks; and that she could not stand up straight, which had been the case "for many years." (*Id*.) She reported that she had received an epidural injection in July 2017, which provided "significant relief of back and leg symptoms for about 3 months." (*Id*.)

On examination, Cohen-Aikens was unable to perform heal and toe walking, had severely impaired tandem gait, and had flat feet. (R. 193, 455.) Her cervical flexion was restricted with moderate neck pain, and her thoracolumbar spine decompensated anteriorly six inches, but she could forward flex to bring her fingertips within two inches of her toes with some moderate low back pain. (R. 193-94, 455-56.) In her upper extremities, light touch was intact throughout, range of motion were full, and strength was 5/5 except for 4/5 deltoid strength, but reflexes were absent. (R. 194, 456.) In her lower extremities, light touch was intact; her passive hip, knee and ankle range of motion was full and painless; her strength was 5/5; her patella reflexes were 1+; and her ankle reflexes were absent. (*Id*.)

Dr. Huang noted that a lumbar MRI from December 2017 showed congenital stenosis throughout the lumbar spine; mild degenerative disc disease at levels L4-S1 with L4-L5 vacuum sign; minimal grade 1 spondylolistheses at L4-L5; moderate central stenosis at L4-L5; and moderate to severe facet arthrosis at level L5-S1. (R. 194, 456.) He also noted that lumbar x-rays taken on January 29, 2018 demonstrated dramatic accentuation of spondylolisthesis at L4-5 in the standing position. (*Id*.) A December 2017 cervical MRI showed moderate to severe degenerative disc disease at C2-C7 with moderate to severe foraminal stenosis at C4-C7, but no cord compression. (*Id*.)

Dr. Huang assessed that the "main issue here is a dynamically unstable spondylolisthesis with stenosis at L4-5 and also severe facet arthrosis at L5-S1" which were "concordant with the patient's severe low back pain and neurogenic claudication[19] and radiating leg pain." (R. 194, 456.) Dr. Huang stated that Cohen-Aikens was "likely to require surgery to get significant relief from her issue." (*Id*.) Dr. Huang noted that Cohen-Aikens had "multilevel diffuse cervical spondylosis with axial neck pain," but "[s]he does not appear to have very obvious were [sic] clear radiculopathy." (R. 195, 457.)

### E.   Dr. Aurelio Salon  – January 2016 Consultative Examination

On January 19, 2016, Dr. Aurelio Salon, a consultative examiner referred to by the Division of Disability Determination, examined Cohen-Aikens. (R. 376-80.) Cohen-Aikens reported that she had felt pain in her neck since 2009 due to osteoarthritis, low back pain for approximately 20 years due to a lumbar tear and spinal stenosis, and knee pain due to osteoarthritis since 2008. (R. 376.) She stated that she could cook, clean, do laundry, shop, shower, bathe and dress by

---

[19] Claudication is "limping or lameness." *Dorland's* at 369.

herself. (R. 377.) On examination, Cohen-Aikens had normal gait, used no assistive device, could squat full, and needed no help changing or getting on or off the exam table, but she declined to walk on her heels and toes. (R. 378.) She had full range of motion in her cervical spine, lumbar spine, shoulders and extremities. (R. 378-79.) Her reflexes, sensation and strength were intact. (R. 378.) A right knee x-ray showed degenerative joint disease and a lumbosacral x-ray showed moderate narrowing of the L4-L5 disc space. (R. 379, 381-82.) Dr. Salon opined that "[o]n the basis of the history and the physical just performed, there are no objective findings to support the fact that the claimant would be restricted in her ability to sit or stand or in her capacity to climb, push, pull, or carry heavy objects." (R. 379-80.)

F.     **Dr. R. Gauthier – February 2016 State Agency Consultative Examination**

In a February 5, 2016 report, Dr. R. Gauthier, a state agency medical consultant, found that one or more of Cohen-Aikens's medically determinable impairments reasonably could be expected to produce her pain or other symptoms and that her RFC has exertional limitations. (R. 73-74.) However, Dr. Gauthier disputed her account of her symptoms and pain, finding them only partially credible. (R. 73.) He opined that Cohen-Aikens (a) occasionally could lift and/or carry 20 pounds; (b) frequently could lift and/or carry 10 pounds; (c) could stand and/or walk for 6 hours in an 8-hour workday; (d) had unlimited ability to push and/or pull, though she did have postural limitations and (e) occasionally could climb ramps, stairs, ladders, ropes and scaffolds, and balance, stoop, kneel, crouch and crawl. (R. 74-75.)

G.     **Dr. Aurelio Salon  –  November 2017 Consultative Examination**

On November 22, 2017, Dr. Salon conducted another consultative examination. (R. 390-93.) Cohen-Aikens stated that she could cook, shop, shower, bathe and dress by herself; could

do limited cleaning and laundry; and sometimes received help from her son. (R. 391.) On examination, she had a normal gait without her cane, but she declined to walk on heels and toes or squat. (*Id*.) A musculoskeletal exam was normal. (R. 392.) Her reflexes, sensation and strength were normal; her hand and finger dexterity were intact; and her grip strength was 5/5. (*Id*.) Dr. Salon opined that "[o]n the basis of the history and physical just performed, there are no objective findings to support the fact that the claimant would be restricted in her ability to sit or stand or in her capacity to climb, push, pull, or carry heavy objects." (R. 393.) Dr. Salon also stated that "[i]n my opinion the cane is not currently medically necessary." (R. 391.)

On November 28, 2017, Dr. Salon completed a Medical Source Statement of Ability to do Work-Related Activities. (R. 394-400.) Dr. Salon checked off that Cohen-Aikens had the full ability under each physical activity listed, including lifting, carrying, sitting, standing and walking. (R. 394-99.) Notably, Dr. Salon opined that she could continuously lift and carry weights up to 100 pounds and that she can sit uninterrupted for 8 hours, stand without interruption for 8 hours, and can walk without interruption for 8 hours. (R. 394-95.)

**IV.    April 20, 2018 Administrative Hearing**

At the administrative hearing on April 20, 2018, Cohen-Aikens testified that she lived alone in an apartment next door to her adult son. (R. 41, 43.) She testified that she was able to shower and bathe, but she had had difficulty raising her arms to do her hair and dressed slowly with some difficulty. (R. 41.) She was able to cook slowly but did very little by way of household chores. (R. 42.) Cohen-Aikens was able to walk to the grocery store and shop, but she used a grocery cart for anything heavy because she could not carry anything and she would shop for larger items when accompanied by her son. (R. 42-43.) She could do her own laundry, but needed

14

her son's help to carry the laundry. (R. 42.) Cohen-Aikens testified that, on a typical day, she woke up, made breakfast, looked at the news, watched television and would sit for a while. (R. 45.) She attended church or Bible study twice a week. (*Id*.)

Cohen-Aikens described her daily pain to be 8 on a 10-point scale (in normal weather) and a 9 or a 10 (when it rains or in extreme temperatures). (R. 46-47.) She testified that she can sit for 30 minutes to an hour, stand with her cane for 5 to 10 minutes until her back buckles and walk slowly for one or two blocks. (R. 43-44.)

Cohen-Aikens treated her pain with physical therapy, medication and injections. (R. 40-48.) She testified that she had been prescribed painkillers, but that they caused constipation, so she used Tylenol three or four times per week. (R. 45-46.) She received an epidural steroid injection about once a year, which gave her some relief and made her "sort of pain-free," but they did not allow her to "move any better." (R. 40.) She stated that she only received the injection once a year because the injection was a steroid, the injection was expensive, and the experience was humiliating and traumatic. (*Id*.) She used a cane, which had been prescribed by her knee surgeon after her knee replacement surgeries in 2014. (R. 39.) She also had a walker, but did not use it because it required bending and aggravated her back pain. (*Id*.) She had seen a doctor for a surgical consultation, but she had not yet decided whether to have back surgery. (R. 39-40.)

Vocational expert ("VE") Edna Clark also testified at the hearing. (R. 53-66.) VE Clark classified Cohen-Aikens's past relevant work as a receptionist (Dictionary of Occupational Titles ("DOT") 237.367-038), a sedentary job. (R. 53-54.) She testified that no job title specifically matched Cohen-Aikens's IRS job but "the text describing receptionist in the DOT would cover all

these other tasks that she performed." (R. 53-54.) The VE testified that a person limited to light work could perform the job. (R. 54.) A person limited to only sedentary work would still be able to perform this job as it was "normally performed." (*Id*.) The job still would be available to a person who needed to use a cane or was limited to only occasional climbing, balancing, stooping, kneeling, crouching and crawling. (R. 55.)

VE Clark gave examples of conditions that would disqualify Cohen-Aikens from performance of her past work: the inability to stay on-task for 93% of the working day and 3 absences from work per month would be too disruptive to the workflow. (R. 55, 60.) The VE also noted that if she were limited to less than frequent reaching and handling, she would be precluded from her past work. (R. 65.) In addition, if Cohen-Aikens could sit, stand or walk, in combination, for less than 8 hours in an 8-hour workday, she would be precluded from performing any kind of work—whether her past work, or other work. (R. 56.)

## V.   ALJ Solomon's Decision And Appeals Council Review

Following the five-step process, *see infra* Legal Standards Section II, ALJ Solomon determined that Cohen-Aikens did not have a disability within the meaning of the Act. (R. 16-31.) The ALJ found at step one that she had not engaged in substantial gainful activity during the period from her alleged onset date to the date of his decision. (R. 21.) At step two, the ALJ determined that Cohen-Aikens had the following severe impairments: left knee status post total knee replacement, right knee status post partial knee replacement, lumbar degenerative disc disease and cervical spondylosis. (*Id*.) The ALJ also considered her obesity, but found it to be a non-severe impairment. (*Id*.) At step three, the ALJ found that Cohen-Aikens did not have an

impairment or combination of impairments that met or equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 22.)

The ALJ then assessed Cohen-Aikens's RFC and determined that she was able to perform the full range of light work.[20] and that she can lift/carry 20 pounds occasionally and 10 pounds frequently; and sit/ stand/walk for 6 hours in an 8-hour workday. (R. 22.) Although her medically determinable impairments reasonably could be expected to cause the alleged symptoms, the ALJ found that her statements concerning the intensity, persistence and limiting effects of these symptoms were not consistent with the evidence in the record.[21] (R. 23.) The ALJ assigned (a) "great weight" to the report of Dr. Gauthier; (b) "substantial weight" to Dr. Salon's first examination findings and his finding in the second examination that a cane was not necessary; (c) "partial weight" to Dr. Salon's second examination findings; and (d) "little weight" to the opinions of Cohen-Aikens's two treating physicians, Dr. Griffin and Dr. Frankel.[22] (R. 26.) Based on the RFC, the ALJ concluded at step four that Cohen-Aikens could perform her past relevant work as a receptionist. (R. 26-27.) Thus, the ALJ concluded that she was not disabled. (R. 27.)

Following the ALJ's June 15, 2018 decision, Cohen-Aikens sought review from the Appeals Council, which denied her request on March 11, 2019. (R. 1-6.)

---

[20] Light work involves lifting and carrying 20 pounds occasionally and 10 pounds frequently. *See* 20 C.F.R. § 404.1567(b). It also generally requires standing/walking at least six hours a day and sitting the remainder of the day. *See* Social Security Ruling 83-106, at **5-6 (1983 WL 31251).

[21] The ALJ did include "alternative findings" with postural limitations since Cohen-Aikens's doctors noted some limitations in bending (stooping). (R. 26.)

[22] The ALJ's decision does not reflect the weight that he gave to the opinions of Dr. Huang.

**LEGAL STANDARDS**

I.    **Standard Of Review**

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does [the Court] determine whether the Commissioner's conclusions were supported by substantial evidence." *Ulloa v. Colvin*, No. 13-CV-04518 (ER), 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) (citing *Tejeda v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision[.]" *Id.*; *accord Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

Absent legal error, the ALJ's disability determination only may be set aside if it is not supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (vacating and remanding ALJ's decision). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "The substantial evidence standard is a very deferential standard of review—even more so than the clearly erroneous standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder *would have to conclude otherwise*." *Banyai v. Berryhill*, No. 17-CV-01366, 2019 WL 1782629, at *1 (2d Cir. Apr. 24, 2019) (summary order) (quoting *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original) (internal quotation marks omitted)). If the findings of the Commissioner as to any fact are

18

supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995).

## II.      Determination Of Disability

A person is considered disabled for benefits purposes when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

> An individual shall be determined to be under a disability only if [the combined effects of] [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do his previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In determining whether an individual is disabled, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . [continuous period of 12 months], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 ["Listings"] . . . and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. . . .

20 C.F.R. §§ 404.1520(a)(4).

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4). After the first three steps (assuming that the claimant's impairments do not meet or medically equal any of the Listings), the Commissioner is required to assess the claimant's RFC "based on all the relevant medical and other evidence in [the claimant's] case record." 20 C.F.R. §§ 404.1520(e). A claimant's RFC is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 405.1545(a)(1).

The claimant bears the burden of proof as to the first four steps. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999). It is only after the claimant proves that she cannot return to work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given the claimant's RFC, age, education and past relevant work experience. *Id.* at 51

III.   **The Treating Physician Rule**[23]

An ALJ must follow specific procedures "in determining the appropriate weight to assign

a treating physician's opinion." *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019). First, the ALJ

must decide whether a treating physician's opinion is entitled to controlling weight. *See id.* The

ALJ must give "controlling weight" to the opinion of a claimant's treating physician as to the

nature and severity of the impairment as long as it "'is well-supported by medically acceptable

clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20

C.F.R. § 404.1527(d)(2)); *see also Halloran*, 362 F.3d at 32 ("[T]he opinion of the treating physician

is not afforded controlling weight where . . . the treating physician issued opinions that are not

consistent with other substantial evidence in the record, [including] the opinions of other medical

experts.").

If the ALJ decides the treating physician's opinion is not entitled to controlling weight, the

ALJ must determine how much weight, if any, to give it. *Estrella*, 925 F.3d at 95.  "Even if the

treating physician's opinion is contradicted by other substantial evidence, and so is not

controlling, it may still be entitled to significant weight 'because the treating source is inherently

more familiar with a claimant's medical condition than are other sources.'" *Tankisi v. Comm'r of*

*Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013) (quoting *Schisler v. Bowen,* 851 F.2d 43, 47 (2d Cir.

---

[23] On January 18, 2017, the SSA promulgated a final rule that dramatically changes the nature of the evaluation of medical opinion evidence. Revisions to Rules Regarding the Evaluation of Medical Opinion Evidence, 82 Fed. Reg. 5844, 2017 WL 168819 (Jan. 18, 2017) (codified at 20 C.F.R. §§ 404 & 416). These new regulations apply only to claims filed with the SSA on or after March 27, 2017. Accordingly, because Plaintiff's claims were filed before that date, to the extent that the regulations regarding medical opinion evidence are cited in this Opinion and Order, the Court is referring to the version of the regulations effective before March 27, 2017.

1988)). In deciding what weight to assign, the ALJ must "explicitly consider" the following, nonexclusive factors: "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella*, 925 F.3d at 95-96 (citing *Burgess*, 537 F.3d at 129) (additional citations omitted).

At both steps, the ALJ must "give good reasons in [its] notice of determination or decision for the weight [it gives the] treating source's [medical] opinion." *Halloran*, 362 F.3d at 32 (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) ("The ALJ was required either to give [the treating physician's] opinions controlling weight or to provide good reasons for discounting them."). "An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two is a procedural error." *Estrella*, 925 F.3d at 96 (citing *Selian v. Astrue*, 708 F.3d 409, 419-20 (2d Cir. 2013)). However, if "a searching review of the record" assures the Court "that the substance of the treating physician rule was not traversed," the Court should affirm. *Id.* (citing *Halloran*, 362 F.3d at 32).

## DISCUSSION

Plaintiff argues that her case should be remanded to the SSA for a calculation of benefits because: (1) the ALJ failed to appropriately weigh the opinions of Plaintiff's treating physicians; (2) the ALJ failed to analyze the applicable listings; and (3) the ALJ failed to compare Plaintiff's RFC with the physical and mental demands of her past relevant work. (Pl.'s Mem. In Support Mot. For J. On The Pleadings ("Pl.'s Mem."), ECF No. 22.) In opposition to Plaintiff's motion, and in support of his cross-motion, the Commissioner argues that the ALJ's decision is supported by substantial evidence and is free of legal error. (*See* Comm'r Mem.)

For the reasons set forth below, the Court finds that the ALJ erred by failing to comply with the treating physician rule and that remand is required.

I.    **The ALJ Erred By Failing To Comply With The Treating Physician Rule**

Plaintiff argues that the ALJ violated the treating physician rule because he gave little, rather than controlling, weight to the opinions of Dr. Griffin and Dr. Frankel without good reasons for doing so and without giving good reasons for the weight assigned. (Pl.'s Mem. at 12-14.) The Commissioner argues that the ALJ is not required to give controlling weight to a treating source's medical opinion that is not supported by medical evidence or is contradicted by other substantial evidence in the record and that the ALJ properly gave greater weight to the opinions of the consultative examiner, Dr. Salon. (Comm'r Mem. at 17-21.) For the reasons set forth below, the Court finds that the ALJ failed to comply with the treating physician rule in considering the opinions of Dr. Griffin and Dr. Frankel and that the case should be remanded.

The ALJ gave Dr. Griffin's opinions little weight. (R. 26.) The ALJ recognized that Dr. Griffin was a treating doctor, but stated that his opinions were not supported by substantial evidence and that the limitations found by Dr. Griffin were "grossly disproportionate to clinical findings" and "totally unsupported by objective findings." (*Id*.) The ALJ noted that Plaintiff had "received [from Dr. Griffin] very conservative treatment, which has been noted to be effective (epidurals) for several months." (*Id*.) Instead, the ALJ gave substantial weight to the January 2016 opinion of Dr. Salon, finding that the treatment records between that alleged onset date and Dr. Salon's opinion "indicate[d] no limitations[,]" and "partial weight" to the November 2017 opinion by Dr. Salon, finding that some treatment notes showed limitations of movement in the neck. (*Id*.) The ALJ gave substantial weight to the portion of the opinion finding that a cane was not necessary.

(*Id*.) The ALJ also gave great weight to the opinions of the state agency medical consultant, Dr. Gauthier. (*Id*.)

In discounting Dr. Griffin's opinion, the ALJ stated that the limitations found by Dr. Griffin were "grossly disproportionate to clinical findings[,]" but the only specific evidence he cites is Dr. Griffin's treatment note from November 17, 2017, which noted that Cohen-Aikens experienced "excellent relief" with epidurals lasting 3 to 4 months. (R. 26.) The ALJ concluded that further clarification was not necessary because the limits stated were "totally unsupported by objective findings." (*Id*.) Yet, as the Second Circuit has explained, "[t]he requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even—and perhaps especially—when those dispositions are unfavorable." *Snell*, 177 F.3d 128, 134 (2d Cir. 1999). "A claimant . . . who knows that [his] physician has deemed [him] disabled[ ] might be especially bewildered when told by an administrative bureaucracy that [he] is not, unless some reason for the agency's decision is supplied." *Id.*

The opinion of a consultative examiner can be substantial evidence to justify assigning less-than-controlling weight to a treating physician's opinion in certain circumstances. *See, e.g.*, *Straughter v. Comm'r of Soc. Sec.*, No. 12-CV-00825 (DAB) (DCF), 2015 WL 6115648, at *17 (S.D.N.Y. Oct. 16, 2015) (opinion of one-time consultative examiner would need to be "sufficiently substantial" to constitute evidence that could undermine treating physician's opinion); *see also Mongeur*, 722 F.2d at 1039. However, the ALJ must provide more than a conclusory explanation for weighing the opinion of a consultative examiner more heavily than the opinion of a treating physician. *See Hamm v. Colvin*, No. 16-CV-00936 (DF), 2017 WL 1322203, at *23 (S.D.N.Y. Mar. 29, 2017); *see also Estrella*, 925 F.3d at 98 (Second Circuit has "frequently

'cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination.'") (quoting *Selian*, 708 F.3d at 419). Here, the ALJ offered no more than a conclusory explanation for assigning greater weight to Dr. Salon's opinion. Thus, to the extent that he relied on those opinions in deciding to give Dr. Griffin's opinions less-than-controlling weight, the Court finds that he failed to provide good reasons for his decision.

In any event, even if the ALJ was entitled to give Dr. Griffin's opinion less than controlling weight he failed to give good reasons for the little weight assigned. *See Estrella*, 925 F.3d at 96; *see also Richardson v. Comm'r of Soc. Sec.*, 339 F. Supp. 3d 107, 114 (W.D.N.Y. 2018) ("good reasons" must be supported by evidence in record and sufficiently specific). Notably, the ALJ did not discuss the medical evidence supporting Dr. Griffin's opinions, such as Dr. Frankel's opinion (which the ALJ gave little weight for largely the same reasons), or Dr. Griffin's own examination and diagnostic tests. (R. 440-52.) Moreover, while the ALJ recognized that "per Dr. Huang, [Cohen-Aikens's] condition may have worsened," he did not discuss how Dr. Huang's assessment, or the most recent x-rays and MRI on which it was based, factored into his assessment of the treating physician's opinions. The ALJ also does not discuss Dr. Griffin's opinion regarding Plaintiff's limitations in attention and concentration due to pain (R. 436) or provide any reason for not crediting it. *See, e.g., Morris v. Berryhill*, No. 1:16-CV-00973 (MAT), 2018 WL 2979095, at *5 (W.D.N.Y. June 14, 2018) (pain management specialist was pain management specialist "fully qualified to opine as to the impact of Plaintiff's pain on her ability to concentrate and maintain attention").

The fact that Dr. Griffin pursued what the ALJ characterizes as "a very conservative treatment regimen" also is not a good reason for the little weight assigned. "The Second Circuit

has cautioned against discounting the opinion of a treating physician merely because the physician recommended a conservative treatment regimen." *See Perez v. Berryhill*, No. 17-CV-00055 (JAM), 2018 WL 525993, at *4 (D. Conn. Jan. 24, 2018) (citing *Burgess*, 537 F.3d at 129); *see also McCleese v. Saul*, No. 18-CV-04494 (AT) (SDA), 2019 WL 3037308, at *13 (S.D.N.Y. June 26, 2019), *report and recommendation adopted sub nom. McCleese v. Berryhill*, 2019 WL 3034892 (S.D.N.Y. July 11, 2019). In addition, the Court questions whether Plaintiff's treatment regimen, which included epidural injections and recommended lumbar surgery is appropriately characterized as "conservative." *See, e.g., Scognamiglio v. Saul*, 432 F. Supp. 3d 239, 249-50 (E.D.N.Y. 2020) (treatment consisting of physical therapy, acupuncture, pain medication and epidural injections incorrectly characterized as conservative); *see also Wood v. Berryhill*, No. 1:16-CV-00570 (MAT), 2018 WL 5276081, at *4 (W.D.N.Y. Oct. 24, 2018) (plaintiff's progressing treatment including pain medication and epidural injections not conservative).

Finally, the ALJ also relied on his determination that Dr. Griffin "was not a specialist." (R. 26.) However, Dr. Griffin, who graduated from Harvard Medical School, and is Board-certified in pain management, specializes in anesthesiology and pain management at HSS. (*See* R. 287; Physician Profile, Dr. Robert Stewart Griffin, available at https://www.nydoctorprofile.com/dispatch; HSS web page for Robert S. Griffin, MD, PhD, available at https://www.hss.edu/physicians_griffin-robert.asp.) Thus, this factor supported giving Dr. Griffin's opinion greater weight, not less. *See, e.g., Hamm v. Colvin*, No. 16-CV-00936 (DF), 2017 WL 1322203, at *22 (S.D.N.Y. Mar. 29, 2017) (factor, including fact that treating physician was specialist in pain management should have weighed in favor of according more weight to his opinion).

26

For these reasons, the Court finds that the ALJ erred by failing to provide good reasons for assigning little weight to Dr. Griffin's opinion.[24] Thus, the Court recommends that the case be remanded to the Commissioner for further proceedings. *See Halloran*, 362 F. 3d at 33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.").

## II.   Plaintiff's Remaining Arguments

As set forth above, Plaintiff has identified additional reasons why she contends the ALJ erred. However, because the Court has already determined, for the reasons previously discussed, that remand of this matter for further administrative proceedings is necessary, the Court declines to reach these issues. *See*, *e.g.*, *Bell v. Colvin*, No. 15-CV-01160 (LEK), 2016 WL 7017395, at *10 (N.D.N.Y. Dec. 1, 2016) (declining to reach arguments "devoted to the question whether substantial evidence supports various determinations made by [the] ALJ" where the court had already determined remand was warranted); *Morales v. Colvin*, No. 13-CV-06844 (LGS) (DF), 2015 WL 13774790, at *23 (S.D.N.Y. Feb. 10, 2015) (court need not reach additional arguments regarding ALJ's factual determinations "given that the ALJ's analysis may change on these points upon remand"), *report and recommendation adopted*, 2015 WL 2137776 (S.D.N.Y. May 4, 2015). However, I briefly address below one of Plaintiff's arguments, which warrants consideration on remand.

---

[24] On remand, the ALJ also should reconsider the opinion of Dr. Frankel, who the Commissioner characterizes as her "primary care physician" (Comm'r Mem. at 8), in light of this Opinion and consider whether further develop of the record is warranted with respect to Dr. Frankel's treatment of Plaintiff.

The ALJ failed to mention or discuss any Listing under which Plaintiff claims to be disabled. Plaintiff claims that her impairments meet Listing 1.04 for "disorders of the spine." (*See* Pl. Mem. at 18-20.) On remand, after properly applying the treating physician rule, the ALJ shall determine and provide explanation as to whether Plaintiff's impairments meet Listing 1.04. *See Torres v. Colvin*, No. 12-CV-06527 (ALC) (SN), 2014 WL 4467805, at *7 (S.D.N.Y. Sept. 8, 2014) (although not determinative, court must consider treating physician opinions when evaluating whether claimant's disability meets criteria of Listings-level impairment).

## III.    Remand For Further Proceedings Is Appropriate

Plaintiff moves the Court to remand for the calculation of benefits or, in the alternative, to remand for further proceedings. (Pl.'s Mem. at 25.) The court may remand solely for the calculation of benefits when "the records provide[ ] persuasive evidence of total disability that render[s] any further proceedings pointless." *Barthelemy v. Saul*, No. 18-CV-12236 (ER) (JLC), 2019 WL 5955415, at *7 (S.D.N.Y. Nov. 13, 2019), *report and recommendation adopted*, 2020 WL 1528479 (S.D.N.Y. Mar. 31, 2020) (quoting *Williams v. Apfel*, 204 F.3d 48, 50 (2d Cir. 1999)). However, where "the ALJ has applied an improper legal standard," courts routinely remand to the Commissioner for further development of the evidence. *See id.* (citing *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (internal quotation marks and alterations omitted). Under the circumstances here, the Court finds that remand for further proceedings is appropriate so that the ALJ may consider the medical evidence in accordance with the treating physician rule.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is GRANTED IN PART and DENIED IN PART, the Commissioner's cross-motion is DENIED, and the case is

remanded to the ALJ pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

DATED:      June 13, 2020
               New York, New York

_____
**STEWART D. AARON**
**United States Magistrate Judge**